## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 15 |
| | ) |
| MOTORCYCLE TIRES & ACCESSORIES | ) Case No. 19-12706 (KBO) |
| LLC, *et al*.,[1] | ) Joint Administration Requested |
| | ) |
| Debtors in a Foreign Proceeding | ) |
| | ) |

## FOREIGN REPRESENTATIVE'S MOTION FOR INTERIM AND FINAL ORDERS AUTHORIZING (I) THE DEBTORS TO ASSUME THE AGENCY AGREEMENT, (II) THE CONDUCT OF THE STORE CLOSING SALES, WITH SUCH SALES TO BE FREE AND CLEAR OF ALL LIENS, CLAIMS AND ENCUMBRANCES, AND (III) GRANTING RELATED RELIEF

KPMG, Inc., ("KPMG" or the "Foreign Representative"), in its capacity as the court-appointed monitor and authorized foreign representative for the above-captioned debtors (collectively, the ("Debtors")), in the Canadian proceeding (the "Canadian Proceeding") commenced under the Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, as amended (the "CCAA"), pending before the Superior Court in Commercial Division in the District of Montreal (the "Canadian Court"), hereby moves (this "Motion") this Court, pursuant to sections 105(a), 363, 365, 1501, 1507, 1520 1519, 1520 and 1521 of title 11 of the United States Code, (the "Bankruptcy Code"), Rules 2002, 6003, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") for the entry of an interim order, substantially in the form attached hereto as **Exhibit A** (the "Interim Order"), and a final order (the "Final Order" and together with

---

[1]     The Debtors in these chapter 15 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Motorcycle Tires & Accessories LLC (8629); Moncy Holding Company, Inc. (6755); Moncy Financial Services Company, Inc. (7515); Moncy LLC (3654); and Nichols Motorcycle Supply, Inc. (4371). The Debtors' mailing address is 1550 Melissa Court, Corona, CA 92879.

the Interim Order, the "Proposed Orders"), substantially in the form to be filed prior to the Final Hearing (i) authorizing the Debtors, upon entry of the Final Order, to assume the Agency Agreement (the "Agency Agreement") dated as of December 18, 2019, by and between debtor Motorcycle Tires & Accessories LLC ("MTA") on the one hand and Gordon Brothers Commercial & Industrial LLC ("Gordon Brothers" or the "Agent"), on the other, a copy of which is attached as Exhibit 1 to each of the Proposed Orders; (ii) authorizing the Debtors to conduct liquidation sales in accordance with the terms of the Agency Agreement, with such sales to be free and clear of all liens, claims, and encumbrances; and (iii) granting certain related relief.  In support of this Motion, the Foreign Representative relies on the *Declaration of Maxime Codère in Support of Foreign Representative's (I) Verified Petitions under Chapter 15, (II) Motion for Joint Administration, (III) Motion for Provisional and Final Relief in Recognition of a Foreign Main Proceeding, (IV) Motion to Establish Certain Notice Procedures in Connection with Filing of Verified Petitions under Chapter 15 and (V) Motion to Assume Agency Agreement* (the "Codère Declaration"),[2] which was filed contemporaneously with this Motion and is incorporated herein by reference.  In further support of this Motion, the Foreign Representative respectfully represents as follows:

<div align="center">**JURISDICTION AND VENUE**</div>

1.    This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334.

2.    These cases have been properly commenced pursuant to section 1504 of the Bankruptcy Code by the filing of petitions for recognition (collectively, the "Petitions for Recognition") of the Canadian Proceeding pursuant to section 1515 of the Bankruptcy Code.

---

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Codère Declaration.

3.      This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

4.      Venue is proper in this Court and this District pursuant to 28 U.S.C. § 1410.

5.      The statutory predicates for the relief requested herein are sections 105(a), 363, 365, 1517, 1519, 1520 and 1521 of the Bankruptcy Code.

## BACKGROUND

### A.      General Background

6.      On the date hereof, (the "Petition Date"), the Foreign Representative filed with this Court verified voluntary petitions (collectively, the "Chapter 15 Petitions") for each of the Debtors under chapter 15 of the Bankruptcy Code (the "Chapter 15 Cases").

7.      The Canadian Proceeding was commenced under the CCAA, pursuant to which the Canadian Court entered an order appointing KPMG as monitor and authorizing it to act as foreign representative of the Debtors on December 2, 2019 (as amended and restated on December 12, 2019, the "CCAA Order").

8.      Additional information about the Debtors' business, the events leading up to the Petition Date, and the facts and circumstances surrounding the Debtors, the Canadian Proceeding and the Chapter 15 Cases can be found in the Codère Declaration.

### B.      The Prepetition Marketing Efforts

9.      Prior to the commencement of the Canadian Proceeding, Debtors' management attempted to sell the Debtors' U.S. inventory to potentially interested parties, including some of the Debtors' competitors, customers, and suppliers.  In early October, Debtors' management began soliciting interest from the Debtors' 30-40 key customer accounts regarding the possibility of acquiring the Debtors' U.S. inventory through large bulk sales.  For smaller bulk sales of specific lists of assets, the Debtors ultimately reached out to over 100

3

dealers to gauge their interest. Debtors' management also contacted some international distributors in Mexico and elsewhere regarding the possibility of acquiring all, or some portion of, the Debtors' assets. While some of these parties expressed initial interest in acquiring different portions of the assets, none of them were willing to buy the Debtors' inventory for an amount equal to or in excess of the Debtors' costs of such inventory. Because the Debtors do not manufacture their inventory, any potential purchaser could simply acquire the same products from the Debtors' suppliers, presumably at the same cost paid by the Debtors. Thus, the fact that no interested party emerged that was willing to pay the Debtors their full inventory cost was not surprising.

10.    Ultimately, the Debtors, with the advice and consent of KPMG, as monitor, entered into a term sheet with Gordon Brothers to liquidate its remaining inventory on December 10, 2019. That term sheet eventually gave rise to the Agency Agreement that is the subject of this Motion. The Foreign Representative has confirmed that the rates to be paid to Gordon Brothers under the Agency Agreement are consistent with market rates paid to liquidators under similar circumstances.

## C.    The Agency Agreement

11.    Under the terms of the Agency Agreement, subject to the Court's approval of the Proposed Orders, the Agent will serve as the exclusive agent to MTA for the purpose of conducting a sale of MTA's assets (the "Liquidation Sales") including but not limited to (a) all inventory, supplies, finished goods, raw materials, work-in-process, samples, in-transit, packaging materials and other inventory of MTA as set forth on Exhibit A to the Agency Agreement (the "Inventory"); (b) all accounts receivable and intercompany receivables (together the "Accounts Receivable") and (c) All equipment, computer systems, computer

4

hardware, wiring & connections, vehicles, rolling stock, tools equipment, spare parts, furnishing, office equipment, fixtures, furniture, and other fixed Assets which are owned by MTA (collectively, the "Equipment and FF&E" and together with the Inventory and the Accounts Receivable the "Assets") wherever located, including MTA's warehouses in Louisiana, California, and Ohio (the "Facilities"), using the procedures outlined in the Agency Agreement, and, subject to the terms contained in the Agency Agreement. The Debtors seek to assume the Agency Agreement so that they may leverage the experience and resources of the Agent in performing large-scale liquidations while retaining control over the sale process, which the Debtors believe will provide the maximum benefit to the estates.

12. The material terms of the Agency Agreement are described in the summary chart below.[3]

| Provision | Description |
|---|---|
| **Appointment of Agent**<br><br>*Agency Agreement §1* | Agent appointed to conduct Sale of the Assets and collection of the Accounts Receivable. The Assets are defined as:<br>a. All inventory, supplies, finished goods, raw materials, work-in-process, samples, in-transit, packaging materials and other inventory of the Company as set forth on Exhibit A (the "Inventory");<br>b. All accounts receivable and intercompany receivables (together the "Accounts Receivable"); and<br>c. All equipment, computer systems, computer hardware, wiring & connections, vehicles, rolling stock, tools, equipment, spare parts, furnishings, office equipment, fixtures, furniture, and other fixed Assets which are owned by the Company (collectively, the "Equipment and FF&E"). |

---

[3] Capitalized terms used but not otherwise defined in this summary chart shall have the meanings ascribed to them in the Agency Agreement. To the extent this summary differs in any way from the terms set forth in the Agency Agreement, the terms of the Agency Agreement shall control.

IMPAC 6514696v.4

| **Term**<br><br>*Agency Agreement §2* | The Term commenced upon the date of the Agreement (the "Commencement Date") and shall terminate upon the earliest of the completion and approval of the Final Settlement and<br>a. 90 days (or within the terms of the relevant warehouse exit agreement, as applicable)—for Inventory<br>b. 180 days—for Accounts Receivable; and<br>c. 90 days—for Equipment and FF&E |
|---|---|
| **Agent**<br>**Responsibilities**<br><br>*Agency Agreement §3* | During the Term Agent shall:<br>a. Develop an advertising and marketing plan for the sale or other disposition strategy for all Inventory.<br>b. Recommend that the Company accept or reject certain offers and negotiate the terms and conditions of any such sales.<br>c. Prepare all marketing materials necessary to run a commercially reasonable sale to maximize the value of the assets.<br>d. Recommend and consult with the Company and its advisors in connection with the appropriate pricing or discounts in respect of the Assets.<br>e. Charge and collect on behalf of the Company from all purchasers of the Assets any purchase price together with all applicable taxes in connection therewith and remit same to the Company.<br>f. Oversee the removal of the Assets by purchasers.<br>g. Collect, service, settle, and otherwise resolve the Accounts Receivable on the Company's behalf in compliance with applicable law.<br>h. To the extent that information is available, provide sales reporting.<br>i. Work with the Company to create an employee incentive plan (the "KEIP") to ensure operational continuity throughout the sale process.<br>j. Perform such other related services deemed by the Agent to be required or prudent to facilitate the Sale. |

IMPAC 6514696v.4

| | |
|---|---|
| **Company Responsibilities**<br><br>*Agency Agreement §4* | During the Term, Company shall:<br><br>a. Provide the necessary knowledgeable employees and personnel, as determined by Agent in consultation with the Company, at each of the Facilities, to assist in connection with the Sale, including preparation, sale, shipment and removal of the Inventory in the ordinary course of business in a method satisfactory to meet buyer needs.<br><br>b. Maintain the Inventory at the Facilities in a consistent operational manner as it exists upon execution of this Agreement until expiration of the Term.<br><br>c. Direct all communications related to the Sale of the Assets to Agent and provide Agent with any and all offers or inquires they have received regarding such assets.<br><br>d. Afford Agent and its invitees, buyers and prospective purchasers, representatives, agents and independent contractors, subject to applicable law, reasonable access to, use of and the right to enter any of the Facilities to conduct due diligence of and effect a peaceful transition or transfer of the Assets upon a sale thereof.<br><br>e. Provide the necessary employees and personnel, as determined by Agent in consultation with the Company, to assist in collection of the Accounts Receivable and transfer of any documentation or data to Agent's systems, for a period of up to sixty (60) days from the date of this Agreement.<br><br>f. Provide all security personnel and maintain all alarm systems as is necessary to maintain the Facilities in a secure manner to insure preservation of the Assets in a manner consistent with past practice until all such assets have been sold.<br><br>g. Pay Agent's Fees as and when required pursuant to the terms and conditions of this Agreement.<br><br>h. Pay all occupancy related amounts associated with the Facilities until expiration of the Term.<br><br>i. Maintain all insurance, licenses, permits, and other consents (including any and all tracking as required by law) required to sell the Assets.<br><br>j. Provide necessary legal counsel to draft and negotiate any purchase agreements, bills of sale, or other transfer documents related to the Sale. |

7

| | |
|---|---|
| **Fees**<br><br>*Agency Agreement §5* | A. In consideration of Agent's obligations in connection with the Sale, the Company shall pay to Agent the following fees:<br>(1) For Inventory, seven percent (7.0%) of Gross Proceeds.<br>(2) For the Accounts Receivable, four and a half percent (4.5%) of Gross Collections.<br>(3) For the Equipment and FF&E, ten percent (10.0%) of Gross Proceeds.<br>(4) "Gross Proceeds" shall mean the sum of the gross proceeds received from any sale of an Asset, less any sales tax.<br>(5) "Gross Collections" shall mean the sum of the gross amounts collected on account of Accounts Receivable less any sales tax and less any fees or expenses directly incurred in connection with such collections.<br>B. To the extent an auction is conducted with respect to the Equipment and FF&E, Agent shall be entitled to retain a customary industry standard buyer's premium charged to the purchasers of assets at auctions of this type in addition to the Fee described in Section 5(a)(1) of the Agency Agreement<br>C. For the avoidance of doubt, Agent is not liable under this Agreement for any failure to obtain value from the sale of the Assets and is not guaranteeing any recovery therefrom.<br>D. The Gross Proceeds and Gross Collections from the Sale of Assets shall be distributed in waterfall fashion, in the following order of priority: FIRST: to Agent as reimbursement for all of its approved and documented expenses as referenced on Exhibit A, SECOND: to Agent in an amount equal to its Agent's Fees, and THEREAFTER: as directed by Company.<br>E. Fees payable to Agent pursuant to subsection A of this Section 5 shall be paid by Company as soon as reasonably practicable upon the applicable closing of any sale of Assets, provided that in every instance such Fee shall be paid within seven (7) days of accrual. |
| **Reimbursement of Expense**<br><br>*Agency Agreement §6* | In addition to the Agent's Fees in Section 5, Company shall be obligated to and shall reimburse Agent for the reasonable and documented (a) out of pocket expenses incurred by Agent in connection with the Sale, to the extent incurred by Agent, inclusive of, but not limited to, travel and travel-related expenses, reasonable attorneys' fees and expenses and other miscellaneous out of pocket expenses to the extent categorized and within the aggregate amount budgeted on Exhibit B (the "Budgeted Expenses"). The Budgeted Expenses shall be reimbursed by Company in connection with each Weekly Settlement and shall not exceed $115,000 in the aggregate. |

| | |
|---|---|
| **Proceeds and Expenses**<br><br>*Agency Agreement §9* | A. Deposit of Proceeds. All cash proceeds from the Sale shall be deposited into the Company's account at Bank of Montreal; provided that in the event of an auction (with respect to FF&E) a separate account may be required which Agent shall maintain ("Sale Account"). Company shall be responsible for and shall pay all bank fees and charges, including wire transfer charges, related to all such accounts, including Sale Account from their proceeds received from the Sale. Agent shall provide Company with a weekly written report as to the collections in such Sale Account.<br>B. Additional Approved Expenses. Upon providing Company with evidence that additional expenses are warranted and will increase the overall recovery on the Assets, Agent may request an increase in Budgeted Expenses, such increase to be funded by the Company. Such request shall be subject to Company's consent, which consent shall not be unreasonably withheld or delayed. Agent may allocate or reallocate expenses in the budget among line items in its sole discretion.<br>C. Expenses. Agent shall not be responsible for any of Company's costs or expenses, including, without limitation, operational, occupancy, or occupancy-related costs or expenses, payroll or license fees, or costs, fees or expenses relating to any period prior to or after the Commencement Date, whether or not related to the Sale or to this Agreement. |
| **Debtors' Indemnification**<br><br>*Agency Agreement §12 A&B* | Agent shall defend, indemnify, and hold harmless Company and its affiliates, directors, managers, officers, employees, advisors and representatives from and against any and all losses, costs, expenses (including, but not limited to, reasonable attorneys' fees and disbursements), claims, causes of action, liabilities, suits, proceedings and damages in connection with or related to or arising out of Agent's gross negligence or willful misconduct in connection with the Sale or any material breach by Agent of its obligations or representations/warranties hereunder; provided, however, that such indemnity shall not apply to any loss, cost, expense, claim, cause of action, liability, suit, proceeding or damage to the extent that it is found in a final judgment by a court of competent jurisdiction (not subject to further appeal) to have resulted from Company's gross negligence or willful misconduct. . . .<br><br>Notwithstanding the foregoing or any other provision of this Agreement, Agent shall have no liability to Company and no indemnification obligations hereunder, to the extent relating to or arising out of (i) hazardous materials claims; (ii) product liabilities claims by purchasers, subsequent purchasers or users of any Assets sold in the Sale; (iii) claims by the Company's creditors relating to any amounts paid to Agent pursuant to this Agreement or (vi) liabilities, obligations, and/or proceedings relating to the Assets, the Company's Facilities, and/or Company and its affiliates. |

IMPAC 6514696v.4

| | |
|---|---|
| **Agent's Indemnification**<br><br>*Agency Agreement §12 D* | Company shall defend, indemnify, and hold harmless Agent, each of its affiliates, and each of their respective directors, managers, officers, employees, members, managers and representatives (the "Agent Indemnified Parties") from and against any and all losses, costs, expenses (including, but not limited to, reasonable attorneys' fees and disbursements), claims, causes of action, liabilities, suits, proceedings and damages made, threatened, asserted, brought or commenced in connection with or related to or arising out of (i) Company's gross negligence, misconduct, or unlawful conduct in connection with the Sale; (ii) any breach by Company of its obligations or representations/warranties hereunder; (iii) any hazardous materials or other environmental claims relating to the Assets, the Company's Facilities and/or the Sale; (iv) any product liabilities claims by purchasers, subsequent purchasers or users of any Assets sold in the Sale; (v) any breach of any representation or express or implied warranties, including but not limited to the implied warranties of Company, merchantability, and fitness for a particular purpose; (vi) liabilities, obligations, and/or proceedings relating to the Assets, the Company's Facilities, and/or Company's and its affiliates including, without limitation, their operation and conduct; (vii) any breach by Company in connection with any sale or transaction entered into with any third-party pursuant to this Agreement; (viii) claims by the Company's creditors relating to any amounts paid to or collected by Agent pursuant to this Agreement; or (ix) any tax liability with respect to the Sale of the Assets provided, however, that such indemnity shall not apply to any loss, cost, expense, claim, cause of action, liability, suit, proceeding or damages to the extent that it is found in a final judgment by a court of competent jurisdiction (not subject to further appeal) to have resulted from such Agent Indemnified Parties' gross negligence or willful misconduct. |

## **RELIEF REQUESTED**

13.     By this Motion, the Foreign Representative seeks entry of the Proposed Orders (i) authorizing the Debtors, upon entry of the Final Order, to assume the Agency Agreement, (ii) authorizing the Debtors to conduct the Liquidation Sales in accordance with the terms of the Agency Agreement, with such sales to be free and clear of all liens, claims, and encumbrances, and (iii) granting certain related relief.

IMPAC 6514696v.4

## BASIS FOR RELIEF

### A.      Assumption of the Agency Agreement is Warranted Under the Circumstances

14.      The Foreign Representative requests authority to assume the Agency Agreement, upon entry of the Final Order, pursuant to section 365, 1501, 1507 and 1521 of the Bankruptcy Code.   Section 1521 of the Bankruptcy Code provides, in relevant part, that "[u]pon recognition of a foreign proceeding, whether main or non-main, where necessary to effectuate the purpose of [chapter 15 of the Bankruptcy Code] and to protect the assets of the debtor or the interests of the creditors, the court may, at the request of the foreign representative, grant any appropriate relief, including granting any . . . relief that may be available to a trustee, except for relief available under sections 522, 544, 545, 547, 548, 550, and 724(a) [of the Bankruptcy Code]." 11 U.S.C. § 1521(a)(7).

15.      Meanwhile, section 1507 of the Bankruptcy Code provides that "[s]ubject to the specific limitations stated elsewhere in [chapter 15 of the Bankruptcy Code] the court, if recognition is granted, may provide additional assistance to a foreign representative under [chapter 15] or under other laws of the United States."  *Id.* § 1507(a).

16.      Section 365(a) of the Bankruptcy Code, in turn provides, in pertinent part, that a debtor in possession, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). A debtor's determination to assume or reject an executory contract is governed by the "business judgment" standard. *See, e.g.*, *In re AbitibiBowater Inc.*, 418 B.R. 815, 831 (Bankr. D. Del. Oct. 27, 2009) (finding that a debtor's decision to assume or reject an executory contract will stand so long as "a reasonable business person would make a similar decision under similar circumstances."); *In re HQ Global Holdings, Inc.*, 290 B.R. 507, 511 (Bankr. D. Del. 2003) (stating a debtor's decision to reject an

11

executory contract is governed by the business judgment standard and can only be overturned if the decision was the product of bad faith, whim, or caprice). "The business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interest of the company.'" *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)).

17.    The business judgment rule serves the crucial role in bankruptcy of shielding a debtor's management from judicial second-guessing. *See In re Integrated Res.*, 147 B.R. at 656; *see also Comm. of Asbestos Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986) ("[T]he Code favors the continued operation of a business by a debtor and a presumption of reasonableness attached to a debtor's management decisions."). Generally, courts defer to a debtor in possession's business judgment to assume or reject an executory contract or lease. *See, e.g., Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co., (In re Wheeling-Pittsburgh Steel Corp.)*, 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987) (stating that the business judgment test "requires only that the trustee [or debtor in possession] demonstrate that [assumption] or rejection of the contract will benefit the estate.").

18.    The Foreign Representative, in consultation with his professional advisors, determined that the Assets should be liquidated for the benefit of the Debtors' estates and creditors. Furthermore, after engaging in arms'-length negotiations regarding the Liquidation Sales and conducting reasonable diligence, the Foreign Representative determined that entering into the Agency Agreement would provide the greatest return to the Debtors' estates for the

Assets. Additionally, the Foreign Representative believes that the terms set forth in the Agency Agreement are fair and equitable and present the best path forward with respect to the liquidation of the Assets.

19.    Further, for the Debtors to conclude the Liquidation Sales as quickly and efficiently as possible, and thereby minimize any unnecessary administrative expenses in connection with the prosecution of these Chapter 15 Cases, it is essential that MTA be permitted to continue performing pursuant to the Agency Agreement. The Debtors ceased operations in the United States before the Petition Date and the Debtors do not intend to receive any additional inventory at the Facilities. With no new inventory being shipped to the Facilities, a delay in conducting the Liquidation Sales would have a dramatic impact on the recovery realized with respect to the Assets and would increase administrative costs incurred by the Debtors, including rent. The Agent intends to begin the Liquidation Sales as soon as possible and has become familiar with the Debtors' Assets and Facilities. Moreover, the Agent has overseen similar liquidation sales and best knows how to maximize the value to be obtained by the Debtors during the remainder of such sales.

20.    Failure by MTA to continue performing pursuant to the Agency Agreement at this point would lead only to unnecessary delay and expense that would in turn disrupt these Chapter 15 Cases and the Debtors' efforts to maximize value for all stakeholders. Among other things, the Foreign Representative, the Debtors and their advisors would be compelled to devote valuable time and effort, at considerable expense to the Debtors and their estates, to locating new agents to conduct the Liquidation Sales. Given the effectiveness of the Debtors' prepetition efforts to obtain the best possible terms for liquidation of the Assets and the Agent's familiarity with the Assets, the Foreign Representative believes that it would be unable to locate alternate

13

agents willing to conduct the Liquidation Sales with terms as favorable to the Debtors and their stakeholders as those set forth in the Agency Agreement.

21.     In contrast to the harm that any failure to perform under the Agency Agreement would undoubtedly cause the Debtors and their estates, the Foreign Representative believes that the Debtors will receive significant benefits from performing under the Agency Agreement and allowing the Liquidation Sales to proceed in an efficient and cost effective manner during these Chapter 15 Cases under the guidance and expertise of the Agent.

22.     Accordingly, the Foreign Representative submits that there is sufficient business justification for assumption of the Agency Agreement upon entry of the Final Order.

**B.     Sufficient Business Justification Exists for Continuation of the Liquidation Sales.**

23.     The Foreign Representative requests authority, pursuant to section 363(b) and 1520(a) of the Bankruptcy Code, to sell the Assets through the continuation of the Liquidation Sales in accordance with the Agency Agreement. Section 363 of the Bankruptcy Code applies to the sale of any of the Assets located within the territorial jurisdiction of the United States. *See* 11 U.S.C. § 1520(a)(2); *see also In re Fairfield Sentry Ltd.*, 768 F.3d 239 (2d Cir. 2014). Pursuant to section 1520(a)(3), a foreign representative may operate the debtor's business and may exercise the rights and powers of a trustee under and to the extent provided by section 363. *See* 11 U.S.C. § 1520(a)(3). Section 363(b) of the Bankruptcy Code provides that a foreign representative, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b). Although section 363(b) does not specify a standard for determining when it is appropriate for a court to authorize the use, sale, or lease of property of the estate, courts have required that such use, sale, or lease be based upon the sound business judgment of the debtor. *See, e.g.*, *Myers v. Martin (In re Martin)*, 91

14

F.3d 389, 395 (3d Cir. 1996) (internal citation omitted); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070–71 (2d Cir. 1983); *In re Abbotts Dairies, Inc.*, 788 F.2d 143, 147–48 (3d Cir. 1986) (implicitly adopting the "sound business judgment" test of Lionel Corp.); *In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 175–76 (D. Del. 1991) (holding that the Third Circuit adopted the "sound business judgment" test in *Abbotts Dairies*); *Dai-Icho Kangyo Bank v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153 (Bankr. D. Del. 1999) (same).

24.     As set forth above, the demonstration of a valid business justification by the debtor leads to a strong presumption "that in making [the] business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *In re Integrated Res.*, 147 B.R. at 656. Accordingly, similar liquidation sales are routinely approved by courts in this district in cases involving retail debtors.

25.     As described above and in the Codère Declaration, sound business reasons exist to justify the Liquidation Sales. Based upon the results of their exhaustive analysis of the Debtors' ongoing and future business prospects, the Foreign Representative and his professional advisors have concluded that conducting the Liquidation Sales in accordance with the procedures set forth in the Agency Agreement is the best method to maximize recoveries to the estates. The efficient and effective liquidation sales and procedures, as contemplated in the Agency Agreement and the services to be provided by Agent, will allow the Debtors to quickly vacate the Facilities and avoid the accrual of unnecessary administrative expenses, while maximizing the value of the Assets.

26.     Accordingly, the Foreign Representative has compelling business justifications

for the continuation of the Liquidation Sales in accordance with the terms of the Agency

Agreement.

**C.      The Sale of the Assets Free and Clear of All Liens, Encumbrances, and Other Interests Is Authorized Under Section 363(f) of the Bankruptcy Code**

27.      The Foreign Representative requests approval to sell the Assets on a final "as is"

basis, free and clear of liens, claims, interests and encumbrances, in accordance with section 363

of the Bankruptcy Code. A foreign representative may sell property under section 363(b) of the

Bankruptcy Code "free and clear of any interest in such property of an entity other than the

estate" if any one of the following conditions is satisfied:

> (1) applicable nonbankruptcy law permits sale of such property free and clear of such interests;
>
> (2) such entity consents;
>
> (3) such interest is a lien and the price at which such property is to be sold is greater than the value of all liens on such property;
>
> (4) such interest is in bona fide dispute; or
>
> (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f); s*ee Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345

(E.D. Pa. 1988) (noting that because section 363(f) is written in the disjunctive, a court may

approve a sale free and clear if any one subsection is met); *see also Mich. Emp't Sec. Comm'n v.*

*Wolverine Radio Co. (In re Wolverine Radio Co.)*, 930 F.2d 1132, 1147 n.24 (6th Cir. 1991)

(same).

28.      Although the term "any interest" is not defined in the Bankruptcy Code, the trend

in modern cases is toward a "broader interpretation which includes other obligations that may

flow from ownership of the property." *See Folger Adam Security, Inc. v. DeMatteis/MacGregor,*

*JV*, 209 F.3d 252, 258–59 (3d Cir. 2000). The scope of section 363(f) is not limited to *in rem* interests in a debtor's assets. *Id.* (citing *In re Leckie Smokeless Coal Co.*, 99 F.3d 573, 581–82 (4th Cir. 1996)). A foreign representative can therefore sell a debtor's assets under section 363(f) free and clear of successor liability that otherwise would have arisen under federal statute. *Id.*

29.     The Foreign Representative submits that it is appropriate to sell the Assets on a final "as is" basis, free and clear of any and all liens, claims, and encumbrances in accordance with section 363(f) of the Bankruptcy Code because one or more of the tests of section 363(f) are satisfied. In particular, the Foreign Representative believes that at least section 363(f)(2) of the Bankruptcy Code will be met because the Debtors' prepetition secured lenders are secured by, among other things, the Assets and have consented to the sale of the Assets free and clear. Moreover, with respect to any other party asserting a lien, claim, or encumbrance against the Assets, the Debtors anticipate that they will be able to satisfy one or more of the conditions set forth in section 363(f). Furthermore, the Foreign Representative proposes that any liens, claims, and encumbrances asserted against the Assets be transferred to and attach to the amounts earned by the Debtors under the Liquidation Sales.

30.     Accordingly, the Debtors propose that section 363(f) of the Bankruptcy Code authorizes the transfer and conveyance of the Assets free and clear of any liens, claims, and encumbrances.

**D.      The Court Should Approve the Proposed Sale Guidelines**

31.     As set forth in greater detail below, many Liquidation Laws (defined below) require special and cumbersome licenses, waiting periods, time limits, and other procedures in connection with liquidation sales. Therefore, although the Foreign Representative intends to comply fully with applicable state and local health and safety and consumer protection laws in

17

connection with the Liquidation Sales, the Foreign Representative seeks a waiver of compliance with the Liquidation Laws and instead requests the authority to conduct such sales in accordance with the Agency Agreement.

32.     The Foreign Representative developed the sale guidelines set forth in the Agency Agreement with the intent to provide a means of controlling the administrative burdens on the Debtors' estates that are associated with complying with the Liquidation Laws, while at the same time protecting the interests of their landlords and the applicable governmental agencies enforcing such laws. Accordingly, the Foreign Representative submits that the Agency Agreement adequately address any concerns that the Debtors' landlords or the governmental agencies may raise with respect to the Liquidation Sales, and therefore, the requested relief below seeking the waiver of Liquidation Laws should be approved.

## E.     Payment of the Agent Claims Is Authorized Under Section 363 of the Bankruptcy Code

33.     The Foreign Representative requests authorization, on an interim basis, to pay any amounts owed under the Agency Agreement to the Agent (the "Agent Claims"). Under section 363 of the Bankruptcy Code, a bankruptcy court is empowered to authorize a foreign representative to expend funds in the bankruptcy court's discretion outside the ordinary course of business. *See* 11 U.S.C. § 363. In order to obtain approval for the use of estate assets outside the ordinary course of business, the foreign representative must articulate a valid business justification for the requested use. *See In re Ionosphere Clubs,* 98 B.R. at 176.

34.     As discussed above, the Foreign Representative has determined, in the sound exercise of its business judgment, that the Debtors will receive significant benefits from performing under the Agency Agreement and allowing the Liquidation Sales to proceed during the interim period under the guidance of the Agent. In particular, the assets subject to the

18

Liquidation Sales will be monetized most efficiently and quickly through an orderly process conducted in consultation with an experienced liquidation firm like the Agent.

35.    The Foreign Representative's ability to successfully maximize the value of the Debtors' assets depends in large part upon its ability to continue using the experience and knowledge of the Agent—including its experience with and knowledge of the Debtors' business—to conduct the Liquidation Sales. The Agent will be required to commit significant capital, energy and efforts to conduct the Liquidation Sales. Any disruption to the Liquidation Sales during the interim period would cause significant and unnecessary delays to the process of selling the Assets and may impair the Debtors' ability to receive the necessary funds under the Agency Agreement. For the overall benefit to the Debtors' liquidation efforts, payment of the Agent Claims will ensure maximum value for all interested parties. The Foreign Representative believes that in order to avoid delays in the Debtors' efforts to conduct the Liquidation Sales, it is critical that they be authorized to pay the Agent on account of the Agent Claims.  In fact, the Agency Agreement is at risk if the Debtors are unable to honor the fee structure detailed in the Agency Agreement as any change in timing or amount would create an event of default and termination rights in favor of the Agent.  Accordingly, this Court should grant the requested relief under section 363 of the Bankruptcy Code.

**F.      Exemption from Liquidation Laws Is Warranted and Appropriate**

36.    The states in which the Facilities are located have or may have licensing and other requirements governing the conduct of store closing, liquidation, or other inventory clearance sales, including (but not limited to) state and local rules, laws, ordinances, and regulations related to store closing and liquidation sales, establishing licensing, permitting, or bonding requirements, waiting periods, time limits, bulk sale restrictions, augmentation limitations or fast pay laws that would otherwise apply to the Liquidation Sales, or consumer

19

fraud laws, with the exception of deceptive advertising laws (collectively, the "Liquidation Laws"). Many such Liquidation Laws, however, provide that court-authorized liquidation sales are exempt from compliance therewith.

37.    The Foreign Representative, therefore, requests that the Court authorize the Foreign Representative to conduct the Liquidation Sales without the necessity of, and the delay associated with, complying with the Liquidation Laws. Because the Foreign Representative, the Debtors and their assets are subject to the Court's jurisdiction, *see* 28 U.S.C. § 1334, the Court will be able to supervise the Liquidation Sales. The Liquidation Sales are legitimate methods by which the Foreign Representative can maximize the return from the sale of the Assets for the benefit of the Debtors' estates and creditors. Moreover, creditors and the public interest are adequately protected by the jurisdiction and supervision of the Court.

38.    Even if a state or local law does not expressly except bankruptcy sales from its ambit, the Foreign Representative submits that, to the extent that such state or local law conflicts with federal bankruptcy laws, it is preempted by the Supremacy Clause of the United States Constitution. To hold otherwise would severely impair the relief otherwise available under section 363 of the Bankruptcy Code. In concert with this premise, bankruptcy courts have consistently recognized that federal bankruptcy law preempts state and local laws that contravene the underlying policies of the Bankruptcy Code. *See, e.g.*, *Aloe v. Shenango Inc. (In re Shenango Group, Inc.)*, 186 B.R. 623, 628 (Bankr. W.D. Pa. 1995) ("Trustees and debtors-in-possession have unique fiduciary and legal obligations pursuant to the bankruptcy code . . . . [A] state statute [ ] cannot place burdens on them where the result would contradict the priorities established by the federal bankruptcy code.").

39.    While preemption of state law is not always appropriate, as when the protection

of public health and safety is involved, *see Baker & Drake, Inc. v. Pub. Serv. Comm'n of Nev. (In re Baker & Drake, Inc.)*, 35 F.3d 1348, 1353–54 (9th Cir. 1994) (finding no preemption when state law prohibiting taxicab leasing was promulgated in part as a public safety measure), it is appropriate when, as here, the only state laws involved concern economic regulation. *Id.* at 1353 (finding that "federal bankruptcy preemption is more likely . . . where a state statute is concerned with economic regulation rather than with protecting the public health and safety"). Moreover, pursuant to section 105 of the Bankruptcy Code, the Court has the authority to permit the Liquidation Sales to proceed notwithstanding contrary Liquidation Laws. *See* 11 U.S.C. § 105(a).

40.     Here, section 363 of the Bankruptcy Code, which requires the Debtors to operate their businesses in a way that maximizes recoveries for creditors, will be undermined if the Court does not provide for the waiver of the Liquidation Laws because the Liquidation Laws constrain the Foreign Representative's ability to marshal and maximize assets for the benefit of creditors. Moreover, given the supervision of the Court, the requested waiver will not unduly undermine state and local requirements that would otherwise apply to the Liquidation Sales. The Foreign Representative only requests that the Court authorize the Foreign Representative to conduct the Liquidation Sales without the necessity of, and the delay associated with, obtaining various state licenses or permits, observing state and local waiting periods or time limits, and/or satisfying any additional requirements with respect to conducting the Liquidation Sales as store closings or similar type sales. The Foreign Representative fully intends to be bound by and comply with remaining statutes and regulations, such as health and safety laws.

41.     The Foreign Representative also requests that no other person or entity, including (but not limited to) any lessor or federal, state, or local agency, department, or governmental

21

authority, be allowed to take any action to prevent, interfere with, or otherwise hinder consummation of the Liquidation Sales, or the advertising and promotion (including through the posting of signs) of the Liquidation Sales, in the manner set forth in the proposed orders.

42.     Notwithstanding such requests, the Foreign Representative proposes to serve, within two (2) business days of the entry of the Proposed Orders, copies of such Orders and the Agency Agreement attached thereto, by email, facsimile, or regular mail on the following parties: (a) the Attorney General's office for each state in which the Debtors operate a warehouse, (b) the City Attorney of each city in which the Debtors operate a warehouse, (c) the county consumer protection agency or similar agency for each county in which the Debtors operate a warehouse, (d) the division of consumer protection for each state in which the Debtors operate a warehouse, (e) the chief legal counsel for each local jurisdiction in which the Debtors operate a warehouse (collectively, clauses (a) through (e), the "Applicable Governmental Units"), and (f) the applicable landlord for each Facility (collectively, the "Landlords").

43.     The Foreign Representative further proposes that, to the extent there is a dispute arising from or relating to the Liquidation Sales between any governmental unit (as defined in section 101(27) of the Bankruptcy Code) (each a "Governmental Unit") and the Foreign Representative relating to the Liquidation Laws (such dispute, a "Liquidation Dispute"), the following procedures shall apply (the "Resolution Procedures"):

   a)  The Court shall retain exclusive jurisdiction to resolve the Liquidation Dispute which such Liquidation Dispute will be heard at the Final Hearing, absent a party obtaining expedited relief. Nothing in this Interim Order shall constitute a ruling with respect to any issues to be raised with respect to a Liquidation Dispute. Any Governmental Unit may assert a Liquidation Dispute and shall send a notice (the "Dispute Notice") explaining the nature of the dispute to: (i) counsel to the Foreign Representative, Potter Anderson & Corroon LLP, 1313 N. Market St., Wilmington, DE 19801, Attn: R. Stephen McNeill, Esq.

(rmcneill@potteranderson.com); (ii) counsel to the Bank of Montreal, Chapman and Cutler LLP, 111 West Monroe Street Chicago, IL 60603-4080, Attn: Stephen R. Tetro II, Esq. (stetro@chapman.com), and Womble, Bond & Dickinson LLP, 1313 N. Market St., Suite 1200 Wilmington, DE 19801, Attn: Matthew P. Ward, Esq. (matthew.ward@wbd-us.com); and (iii) counsel to the Agent, Halperin Battaglia Benzija, LLP, 40 Wall Street, 37th Floor, New York, New York 10005, Attn: Christopher J. Battaglia, Esq. (cbattaglia@halperinlaw.net) and Julie Dyas Goldberg, Esq. (jgoldberg@halperinlaw.net) no later than fourteen (14) days following the service of the Interim Order.

b) If the Foreign Representative, the Agent and the Governmental Unit are unable to resolve the Liquidation Dispute within fourteen (14) days of service of the notice, the aggrieved party may file a motion with this Court requesting that this Court resolve the Liquidation Dispute (a "Dispute Resolution Motion").

c) Filing a Dispute Resolution Motion as set forth herein shall not be deemed to affect the finality of this Order or to limit or interfere with the Foreign Representative or the Agent's ability to conduct or to continue to conduct the Liquidation Sales pursuant to this Order and the Agency Agreement, absent further order of this Court.

## G. The Court Should Waive Compliance with Any Restriction in the Leases

44. Certain of the Debtors' leases governing the premises of the stores subject to the Liquidation Sales may contain provisions purporting to restrict or prohibit the Debtors or the Foreign Representative from conducting store closing, liquidation, or similar sales. Such provisions have been held to be unenforceable in bankruptcy cases as they constitute an impermissible restraint on a debtor's ability to properly administer its reorganization case and maximize the value of its assets under section 363 of the Bankruptcy Code. *See Ames Dep't Stores*, 136 B.R. at 359 (deciding that enforcement of such lease restrictions would "contravene overriding federal policy requiring debtor to maximize estate assets. . . ."); *In re R. H. Macy and Co., Inc.*, 170 B.R. 69, 73–74 (Bankr. S.D.N.Y. 1994) (holding that the lessor could not recover damages for breach of a covenant to remain open throughout the lease term, because the debtor had a duty to maximize the value to the estate and the debtor fulfilled this obligation

sk

by holding a store closing sale and closing the store.); *In re Tobago Bay Trading Co.*, 112 B.R. 463, 467–68 (Bankr. N.D. Ga., 1990) (finding that a debtor's efforts to reorganize would be significantly impaired to the detriment of creditors if lease provisions prohibiting a debtor from liquidating its inventory were enforced); *In re Lisbon Shops, Inc.*, 24 B.R. 693, 695 (Bankr. E.D. Mo. 1982) (holding restrictive lease provision unenforceable in chapter 11 case where debtor sought to conduct a liquidation sale). While these decisions were made in the chapter 11 context, there is no reason why the same line of reasoning and application of section 363 of the Bankruptcy Code would not similarly apply in the chapter 15 context.

45.     Thus, as a result of the above and to the extent that such provisions or restrictions exist in any of the leases of the stores subject to the Liquidation Sales, the Foreign Representative requests that the Court authorize the Foreign Representative and/or the Agent to conduct any liquidation sales without interference by any landlords or other persons affected, directly or indirectly, by the liquidation sales.

## H.     The Abandonment of Certain Property in Connection with the Liquidation Sales is Justified

46.     Section 554(a) of the Bankruptcy Code provides that after notice and a hearing, a debtor-in-possession "may abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate." *See Hanover Ins. Co. v. Tyco Indus., Inc.*, 500 F.2d 654, 657 (3d Cir. 1974) (stating that a debtor "may abandon his claim to any asset, including a cause of action, he deems less valuable than the cost of asserting that claim"); *In re Grossinger's Assoc.*, 184 B.R. 429, 432 (Bankr. S.D.N.Y. 1995); *see also Midlantic Nat'l Bank v. N.J. Dep't of Envtl. Prot.*, 474 U.S. 494, 507, n.9 (1986) ("[A] trustee [in bankruptcy] may not abandon property in contravention of a state statute or regulation that is reasonably designed to protect the public health or safety from identified hazards . . . . This exception to the

abandonment power . . . is a narrow one."); *In re Bryson*, 53 B.R. 3, 4–5 (Bankr. M.D. Tenn. 1985) ("The effect of the abandonment is to remove the asset from the jurisdiction of the bankruptcy court.").

47. The Debtors intend to sell all Assets remaining in the Facilities. However, in the event that the Debtors are unable to sell or dispose of all of the Assets following the Liquidation Sales, or determine that the costs associated with holding or selling certain Liquidation Assets exceeds the proceeds that will be realized upon its sale or that such Liquidation Assets are not sellable at all, it would be costly and burdensome to the Debtors' estates to retain such Assets. Thus, to the extent that the Agent does not sell all of the Assets, the Foreign Representative requests that it be authorized upon the conclusion of the Liquidation Sales to abandon the same without incurring liability to any person or entity to maximize the value of the Debtors' assets and to minimize the costs to the estates.

48. Notwithstanding the foregoing, the Foreign Representative and the Agent will utilize all commercially reasonable efforts to remove or cause to be removed any confidential or personally identifying information (which means information which alone or in conjunction with other information identifies an individual, including, but not limited to, an individual's name, social security number, date of birth, government-issued identification number, account number, and credit or debit card number) in any of the Debtors' hardware, software, computers, cash registers, or similar equipment that are to be sold or abandoned.

**I. Appointment of a Consumer Privacy Ombudsman Is Unnecessary.**

49. Section 363(b)(1) of the Bankruptcy Code provides that a foreign representative may not sell or release personally identifiable information about individuals unless such sale or lease is consistent with its policies or upon appointment of a consumer privacy ombudsman pursuant to section 332 of the Bankruptcy Code. The Foreign Representative will not be selling

or releasing personally identifiable information in the course of the Liquidation Sales. The Agent will be authorized, however, to distribute emails and promotional materials to the Debtors' customers consistent with the Debtors' existing policies on the use of consumer information. In light of the foregoing, appointment of a consumer privacy ombudsman is unnecessary under the circumstances of the Liquidation Sales.

## SATISFACTION OF BANKRUPTCY RULE 6003(b)

50.     Pursuant to Bankruptcy Rule 6003(b), any motion seeking to use property of the estate pursuant to section 363 of the Bankruptcy Code within twenty-one (21) days of the Petition Date requires the Foreign Representative to demonstrate that such relief "is necessary to avoid immediate and irreparable harm." There is no question that the Foreign Representative's failure to continue to conduct the Liquidation Sales without interruption would result in immediate and irreparable harm to the Debtors' estates by causing unnecessary delay and expense that would in turn disrupt the Foreign Representative's liquidation efforts and decrease the recovery to the Debtors' estates from the Liquidation Sales.  As stated above, the terms the Debtors have secured with the Agent are the most favorable available to the Debtors and the Agency Agreement is at risk if the Debtors are unable to provide the Agent and prospective buyers with reasonable access to the Debtors' warehouses and inventory as the Agent would assert that such terms create an event of default and termination rights under the Agency Agreement.

51.     For the reasons set forth herein, the Foreign Representative respectfully submits that Bankruptcy Rule 6003(b) has been satisfied and the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors and their estates.

IMPAC 6514696v.4

## WAIVER OF STAY UNDER BANKRUPTCY RULE 6004(h)

52.     Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h). As set forth throughout this Motion, any delay in the Foreign Representative's ability to conduct the Liquidation Sales without interruption would be detrimental to the Debtors, their creditors and estates, and would impair the Foreign Representative's ability to maximize the value of the Assets at this critical time as the Debtors begin the chapter 15 process.

53.     For this reason and those set forth above, the Foreign Representative submits that ample cause exists to justify a waiver of the fourteen-day stay imposed by Bankruptcy Rule 6004(h), to the extent applicable.

## NOTICE

54.     The Foreign Representative has provided notice of this Motion to the following parties or their respective counsel: (a) the office of the U.S. Trustee for the District of Delaware; (b) counsel to BMO; (c) the landlords of the Facilities; and (d) any party that has requested notice pursuant to Bankruptcy Rule 2002. As this Motion is seeking "first day" relief, within two business days of the hearing on this Motion, the Foreign Representative will serve copies of this Motion and any order entered in respect to this Motion as required by Local Rule 9013-1(m). In light of the nature of the relief requested herein, the Foreign Representative submits that no other or further notice of this Motion is necessary or required.

IMPAC 6514696v.4

## CONCLUSION

WHEREFORE, the Foreign Representative respectfully requests this Court enter the

Interim Order, substantially in the form attached hereto, granting the relief requested herein and

all other and further relief as this Court deems just and proper.

Dated:  December 19, 2019
     Wilmington, Delaware

**POTTER ANDERSON & CORROON LLP**

*/s/ R. Stephen McNeill*
Jeremy W. Ryan (DE Bar No. 4057)
R. Stephen McNeill (DE Bar No. 5210)
D. Ryan Slaugh (DE Bar No. 6325)
1313 North Market Street
P.O. Box 951
Wilmington, DE  19899-0951
Telephone:  (302) 984-6000
Facsimile:  (302) 658-1192
E-mail:  jryan@potteranderson.com
     rmcneill@potteranderson.com
     rslaugh@potteranderson.com

*Counsel to KPMG Inc., as Monitor and*
*Foreign Representative for the Debtors*