**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) ) ) | Chapter 15 |
| MOTORCYCLE TIRES & ACCESSORIES LLC, *et al.*,[1] | ) ) ) | Case No. 19-12706 (KBO) Joint Administration Requested |
| Debtors in a Foreign Proceeding | ) ) ) | |

**DECLARATION OF MAXIME CODÈRE IN SUPPORT OF FOREIGN REPRESENTATIVE'S (I) VERIFIED PETITIONS UNDER CHAPTER 15, (II) MOTION FOR JOINT ADMINISTRATION, (III) MOTION FOR PROVISIONAL AND FINAL RELIEF IN RECOGNITION OF A FOREIGN MAIN PROCEEDING, (IV) MOTION TO ESTABLISH CERTAIN NOTICE PROCEDURES IN CONNECTION WITH FILING OF VERIFIED PETITIONS UNDER CHAPTER 15 AND (V) MOTION TO ASSUME AGENCY AGREEMENT**

I, Maxime Codère, declare as follows:

1. I am a Partner of KPMG, Inc. ("KPMG" or the "Foreign Representative") and have personal knowledge of the matters set forth herein. KPMG is the court-appointed monitor and duly authorized foreign representative for the above-captioned debtors (collectively, the "Debtors") in the Canadian proceeding (the "Canadian Proceeding") commenced under the Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, as amended (the "CCAA"), pending before the Superior Court in Commercial Division in the District of Montreal (the "Canadian Court").

2. In my role as monitor, I have become familiar with the history, day-to-day operations, assets, financial condition, business affairs, and books and records of each of the Debtors. Except as otherwise indicated, all facts set forth in this declaration are based upon: (a)

---

[1] The Debtors in these chapter 15 cases, along with the last four digits of each Debtor's federal tax identification number, are: Motorcycle Tires & Accessories LLC (8629); Moncy Holding Company, Inc. (6755); Moncy Financial Services Company, Inc. (7515); Moncy LLC (3654); and Nichols Motorcycle Supply, Inc. (4371). The Debtors' mailing address is 1550 Melissa Court, Corona, CA 92879.

my personal knowledge; (b) my review of the relevant documents; (c) information supplied to me by employees of the Debtors, or other professionals retained by the Debtors; or (d) my opinion based upon my experience and knowledge of the Debtors' operations and financial condition. I am an individual over the age of 18 and, if called upon to testify, I will testify competently to the facts set forth herein.

3. To the best of my knowledge, information and belief, the Canadian Proceeding is a collective judicial proceeding in Canada under Canadian law relating to insolvency or the adjustment of debt in which the assets and affairs of the Debtors are subject to the control and supervision of the Canadian Court. Accordingly, I believe that the Canadian Proceeding is a "foreign proceeding" within the meaning of 11 U.S.C. § 101(23).

4. As described more fully below, the commencement of these cases resulted from extraordinary events, including significant liquidity pressures placed upon the Debtors in light of industry stresses, operational challenges, and a change in foreign relations between the United States and China. These chapter 15 cases, in conjunction with the Canadian Proceeding, will allow for the adjustment of the Debtors' liabilities through an orderly liquidation process of their businesses in the United States by facilitating the sale of their business in Canada combined with a liquidation of all their assets in the United States.

5. I respectfully submit this declaration (the "Declaration") in support of the (i) verified petitions, (ii) the motion for joint administration of these cases, (iii) the motion for a provisional order and final order in recognition of the foreign main proceeding; (iv) the motion to establish certain notice procedures in connection with the filing of the verified petitions; and (v) motion to assume the liquidation agreement with Gordon Brothers Commercial & Industrial LLC ("Gordon Brothers").

**GENERAL BACKGROUND**

A.     **The Debtors' History, Operations and Corporate Structure**

6.     On the date hereof, (the "Petition Date"), the Foreign Representative filed with this Court verified voluntary petitions (collectively, the "Chapter 15 Petitions") for each of the Debtors under chapter 15 of the Bankruptcy Code (the "Chapter 15 Cases").

7.     Corporate Organization. An organizational chart showing the corporate structure of the Debtors' is attached hereto as **Exhibit A**. As set forth on Exhibit A:

(a)     Motovan Corporation ("Motovan") is a Quebec corporation incorporated under the *Canada Business Corporations Act*. It is a family business owned by the Gestion Famille Paladino Inc.

(b)     Moncy Holding Company Inc. ("Moncy Holding") is a U.S. corporation incorporated in Delaware. Moncy Holding is a wholly-owned subsidiary of Motovan and the ultimate parent of the remaining Debtors.

(c)     4295862 Canada Inc. is a Quebec corporation and a wholly-owned subsidiary of Motovan.

(d)     9348069 Canada Inc. is a Quebec corporation and a wholly-owned subsidiary of Motovan. Motovan, 4295862 Canada Inc. and 9348069 Canada Inc. make up the Debtors' Canadian operations and will be referred to herein collectively as "MTV").

(e)     Moncy Financial Services Company Inc. ("Moncy Financial") is a U.S. corporation incorporated in Delaware. Moncy Financial is a wholly-owned subsidiary of Moncy Holding.

(f)     Nichols Motorcycle Supply Inc. ("Nichols") is a U.S. corporation incorporated in Illinois. Nichols is a wholly-owned subsidiary of Moncy Holding.

(g)     Moncy LLC is a limited liability company organized under the laws of Delaware. Moncy LLC is a wholly-owned subsidiary of Moncy Holding.

(h)     Motorcycle Tires & Accessories LLC ("MTA") and together with Moncy Financial, Nichols and Moncy LLC, the "U.S. Subsidiaries"). MTA is a wholly-owned subsidiary of Nichols, and is the operating entity for the Debtors' United States business.

8.  <u>Debtors' Operations</u>.  Motovan distributes, exports, and manufactures parts and accessories for motorcycles, snowmobiles, MX and All-Terrain Vehicle ("<u>ATV</u>") / Utility Task Vehicle across Canada ("<u>UTV</u>").  Motovan's head office is located at 1100, René-Lévesque Blvd. West, suite 2500, Montréal, Québec (the "<u>Montreal Head Office</u>"), with offices and a distribution center in Boucherville, Québec, where approximately 60 full-time and part-time employees are working (the "<u>Canadian Operations</u>").  Motovan has closed its Edmonton, Alberta distribution center as part of its restructuring efforts in the Canadian Proceeding.  Motovan also had an office in London, Ontario, with two (2) employees.  Motovan is also in the process of closing the London office and the employees will be working from home.

9.  Motovan also has distribution centers in the United States that are operated by MTA.  Prior to the filing of the Canadian Proceeding, MTA operated major distribution centers in New York, South Carolina, Louisiana, California and Ohio, but as of the Petition Date, only the Louisiana, California and Ohio distribution centers remain open with approximately 65 full-time employees (the "<u>US Operations</u>").

10. The Debtors' primary assets are inventory, as well as their customer base and employees.

11. The Debtors' management is located in Canada.  The Debtors are operated on a consolidated basis and have the same management team. The sole directors of the Debtors are James Paladino and Carlos Paladino, who are also the sole shareholders of Gestion Famille Paladino Inc., ultimate shareholders of Motovan.  MTV's operations are led by James Paladino, its President; its management also includes Michael Paladino and Carlos Paladino.

12. In 2015, Motovan, through Moncy Holding, acquired MTA.  The acquisition was financed through a short-term loan by Motovan who in return funded the transaction through

secured lenders. MTA's business is primarily focused on the distribution of tires and rims for the ATV/UTV market.

B.    **Events Leading to the Filing of the Canadian Proceeding**

13.    Prior to the acquisition of MTA, Motovan was a profitable company with operations only in Canada. In 2018, MTV had approximately 2,000 clients generating approximately $76M CAN in sales. Nevertheless, Motovan has recorded Net losses during the last two (2) completed fiscal years, FY18 ($3.4 million) & FY17 ($474,000) and is on the way to record a net loss of over $6 million in its current fiscal year. With the current trend, sales for FY19 would amount to $58 million which would represent a 25% decrease comparatively to FY18 and a 31% decrease comparatively to FY16.

14.    Since Motovan's acquisition of MTA, MTA has generated negative earnings before interest, taxes, depreciation and amortization ("EBITDA"). MTA's difficulties affected Motovan, causing it to breach its fixed coverage ratio ("FCCR") covenant with its operating lender, Bank of Montreal ("BMO"), as the FCCR is calculated using the EBITDA on a consolidated basis over the trailing twelve (12) months. In February 2019, Motovan engaged PwC as financial advisor to identify cost savings, enhance operations, and assist Motovan with a view to obtain additional financing through debt financing or moratoriums on debt repayment. Management attempted to improve EBITDA through sale enhancing and cost reduction initiatives, including especially the closing of the two (2) operation centers in the United States, the termination of more than 138 employees of MTA and Motovan and the renegotiation of contracts. Despite these initiatives, Motovan has remained in breach of the FCCR covenant.

15.    For its part, MTA has recorded Net losses since its acquisition by Motovan (FY17) and should be recording a net loss over $2.5 million in its current year. With the current

trend, sales for FY19 would amount to $50 million which would represent a 29% decrease comparatively to FY18 and FY17. MTA's struggles have only intensified over the past year, due to events outside of its control. For example, a significant tire supplier to MTA undermined the operations by engaging in a direct competitive sale to an MTA client without informing MTA management; this created an inventory bulge which caused significant logistical challenges, increased carrying costs and ultimately drained liquidity further. Operating expenses also increased in the U.S. as the ongoing trade war between the U.S. and China led to the implementation of tariffs charged on imports into the U.S. from China which increased the cost of inventory. Over 90% of the Debtors' inventory is sourced out of China.

16. Furthermore, as pressure increased on liquidity, replenishment of inventories became a critical issue to maintain normal operations. For the past few months, the Debtors did not have the liquidity to purchase the level of goods to support their operations, which in turn led to significant freight costs from cross shipping between distribution centers and a lack of efficiencies between the distribution centers. The Debtors are insolvent on a consolidated basis and without the continued support of their operating lender (BMO) they are not in a position to meet their obligations as they become due.

17. <u>Secured Debt</u>. In addition to trade and other liabilities, Motovan has the following secured credit facilities: (a) an operating facility ("<u>Facility A</u>"), which provides for up to CND $18 million in revolving credit to Motovan, provided by BMO, in its capacity as administrative agent (the "<u>Agent</u>") and the lenders from time to time party there to (the "<u>Senior Lenders</u>") and secured by a lien on all present and future assets of the Debtors; (b) an operating facility ("<u>Facility B</u>"), which provides for up to US $15 million in revolving credit to Motovan, provided by the Agent and the Lenders and secured by a lien on all present and future assets of

the Debtors; (c) a term loan facility ("Facility C"), in the original amount of US $5 million, amended in April 2017, provided by the Agent and the Lenders and secured by the assets of the Debtors; (d) a term loan facility (the "IQ Loan"), in the amount of US $2.5 million, provided by Investment Quebec ("IQ") and secured by a second priority guarantee on the assets of the Debtors; (e) a term loan facility ("BDC SAP Loan"), in the amount of CND $2.5 million, provided by BDC Capital Inc ("BDC") and secured by a second priority guarantee on the assets of the Debtors; and (f) a term loan facility ("BDC Loan"), in the amount of US 2.6 million, provided by BDC and secured by a second priority guarantee on the assets of the Debtors. As noted above, the Debtors are in default under their loan agreements with BMO, who has entered into a forbearance agreement with the Debtors to confirm BMO's support of the Debtors' during the Canadian Proceeding.

18. On November 20, 2019, BDC, one of the Debtors' junior secured creditor, served the Debtors with a notice to enforce their secured rights, in accordance with Section 244 of the Bankruptcy and Insolvency Act. I have been informed by the Debtors that BDC has agreed not to enforce its secured rights given the looming implementation of a SISP in respect to the business and assets of Motovan.

19. Altogether, the Debtors have estimated outstanding aggregate secured liabilities of CND $38 million and aggregate unsecured liabilities of CND $26 million. These amounts are summarized in the table below.

| Liabilities<br>At November 15th, 2019<br>CAD '000 | MTV<br>Amount due | | MTA<br>Amount due | Total |
|---|---|---|---|---|
| **Secured debt** | | | | |
| Bank of Montreal | | | | |
|     Facility A | 13 171 | | | |
|     Facility B (USD $8,342*) | | | 11 011 | |
|     Facility C (USD $3,671*) | 4 846 | | | |
| | | 18 017 | 11 011 | 29 028 |
| Investissement Québec | 2 880 | 2 880 | - | 2 880 |
| BDC Capital Inc. - CAD Loan | 2 559 | | | |
| BDC Capital Inc. - USD Loan (USD $2,669*) | 3 524 | | | |
| | | 6 083 | - | 6 083 |
| Sub-Total | | 26 980 | 11 011 | 37 990 |
| **Unsecured debt** | | | | |
| Trade payables | | 10 925 | 9 010 | 19 935 |
| Due to related parties | | 408 | 5 280 | 5 688 |
| Sub-Total | | 11 333 | 14 290 | 25 623 |
| **Total** | | **38 313** | **25 300** | **63 613** |

*\* USD loan converted to CAD at 1.32 FX rate*

20. <u>Canadian Proceeding</u>. The Canadian Proceeding was commenced under the CCAA, pursuant to which the Canadian Court entered an order appointing KPMG as monitor on December 2, 2019 (as amended and restated on December 12, 2019, the "<u>CCAA Order</u>"). A copy of the CCAA Order is attached to the *Declaration of Maxime Codère in Support of Chapter 15 Petitions for Recognition of a Foreign Proceeding Pursuant to Section 1515(b) of the Bankruptcy Code*, filed substantially contemporaneously herewith, as **Exhibit A**.

21. <u>CCAA Order</u>. The primary goals of the Canadian Proceeding are to:

(a) commence a sale and investment solicitation process ("<u>SISP</u>") to market and sell the Debtors' Canadian assets in an expeditious manner in order to maximize recoveries, subject to the requirements of the CCAA Order and Canadian law;

(b) liquidate the Debtors' U.S. Assets through an agency agreement with Gordon Brothers that was executed prior to the Petition Date and is discussed in greater detail below; and

(c) provide a stay of litigation and adverse acts with respect to the Debtors' property to permit them to manage the Debtors' business and operations to facilitate realization on the assets (including by retaining employees of the Debtors, as appropriate).

22. On December 10, 2019, Motovan implemented a SISP in respect of the Canadian Operations, which is being conducted by KPMG CF acting as exclusive financial advisor to Motovan, under the supervision of the Monitor and the Canadian Court. The SISP was implemented prior to approval by the Canadian Court since the main secured creditors, namely BMO, BDC and IQ approved the SISP and its terms and conditions. In view of maximizing the realization of Motovan's business and/or asset for the benefit of its creditors, KPMG CF will conduct a SISP under the supervision of the Monitor, in accordance with the following milestones:

| Milestones | Expected Timing |
| --- | --- |
| Finalization of a list of Potential Purchasers | Completed |
| Communication of the Teaser to the Potential Purchasers | Ongoing |
| Establishment of an Electronic Data Room | Ongoing |
| Due diligence period | December 10, 2019 to January 22, 2020 |
| Deadline for the filing of a bid | January 22, 2020 |
| Filing and presentation of a motion seeking the issuance of an Approval and Vesting Order | Week ending on January 31, 2020 |
| Closing of the transaction (s) | Week ending on February 7, 2020 |

As of the Petition Date, KPMG CF has sent the Teaser to most of the potential purchasers.

23. <u>Chapter 15 Filing Authorized</u>. The CCAA Order specifically contemplates the institution of these Chapter 15 Cases by the Foreign Representative to assist the Debtors in carrying out their duties under the CCAA Order. Paragraph 56 of the CCAA Order provides as follows: "[t]he Monitor, with the prior consent of the [Debtors], shall be authorized to apply as it may consider necessary or desirable, with or without notice, to any other court or administrative body . . . for orders which aid and complement the [CCAA] Order and any subsequent orders of this Court and, without limitation to the foregoing, an order under Chapter 15 of the U.S.

Bankruptcy Code, for which the Monitor shall be the foreign representative of the [Debtors]." (CCAA Order ¶ 56.)

24. <u>Proposed Liquidation</u>. Prior to the commencement of the Canadian Proceeding, I understand that the Debtors' management attempted to sell their U.S. inventory to potentially interested parties, including some of the Debtors' competitors, suppliers and customers. I am informed that in early October, Debtors' management began soliciting interest from the Debtors' 30-40 key customer accounts regarding the possibility of acquiring the Debtors' U.S. inventory through large bulk sales. For smaller bulk sales of specific lists of assets, I understand that the Debtors and their management ultimately reached out to over 100 dealers to gauge their interest. I also understand that Debtors' management contacted some international distributors in Mexico and elsewhere regarding the possibility of acquiring all, or some portion of, the Debtors' assets.

25. As that process unfolded, it became apparent that no potential purchaser was willing to buy the Debtors' inventory for an amount equal to or in excess of the Debtors' costs of such inventory. As a result, the Debtors, with the advice and consent of KPMG, as monitor, entered into an term sheet with Gordon Brothers to liquidate its remaining inventory on December 10, 2019. That term sheet has been submitted to the Canadian Court for consideration, but the Debtors have not asked the Canadian Court for approval of their entry into that agreement because they do not need such approval under the CCAA and the CCAA Order. In the chapter 15, the Debtors are seeking to assume the Gordon Brothers Agreement, as discussed in greater detail in Section F below.

C. **Motion for Provisional and Final Relief in Recognition of A Foreign Main Proceeding**

26. This Court should recognize the Canadian Proceeding as a "foreign main proceeding," as defined in section 1502(4) of the Bankruptcy Code. The Bankruptcy Code

provides that a foreign proceeding is a "foreign main proceeding" if it is pending in the country where the debtor has its "center of its main interests." <u>See</u> 11 U.S.C. § 1517(b)(1).

27. The Debtors' principal corporate, management and strategic functions are undertaken in Canada. Specifically, (1) Motovan, the ultimate Canadian Parent, is the sole shareholder of Moncy Holding, which is the sole shareholder of the U.S. Subsidiaries; (2) the Debtors' corporate headquarters are located in Montreal; (3) the key management personnel of the Debtors are all located in Canada; (4) the Debtors' primary indebtedness consists of secured debt held by the Secured Creditors, all of whom are located in Canada; (5) a majority of the Debtors' creditors are located in Canada; (6) the Debtors' consolidated financial statements are audited in Canada; and (7) the principal books and records of each of the Debtors are located in the Montreal Head Office. The Debtors' principal corporate functions are undertaken in Canada and the Debtors' Canadian and United States operations are integrated and function in a coordinated way such that the U.S. Subsidiaries would be unable to operate or function independently.

28. Pursuant to the *Foreign Representative's Motion for Provisional and Final Relief In Recognition of a Foreign Main Proceeding Pursuant to Sections 105(a), 1519, 1520 and 1521 of the Bankruptcy Code* (the "<u>Recognition Motion</u>"), contemporaneously filed herewith, the Foreign Representative seeks entry of an order (the "<u>Provisional Relief Order</u>") granting certain provisional relief until such time as the Court hears the petitions for recognition. Preliminary relief under section 1519 of the Bankruptcy Code pending this Court's determination with respect to recognition of the Canadian Proceeding as a "foreign main proceeding," is necessary to protect and preserve the Debtors' property and prevent irreparable harm to the Debtors' creditors.

29. The failure to secure the Debtors' assets will irreparably harm the Debtors and deplete their resources, thereby limiting the their ability to maximize the assets available, on an equitable basis, for all creditors of the Debtors. The proposed relief will ease these concerns and allow for the orderly administration of the Debtors' affairs and equitable resolution of the Debtors' liabilities under supervision by the Canadian Court. A stay of actions against the Debtors will not only preserve the Debtors' assets for the benefit of their creditors, but also allow the Debtors to devote their full attention to effectively and efficiently administering their affairs in the Canadian Proceeding.

**D.     Motion for Joint Administration**

30. Joint administration is warranted in these cases. The Debtors are affiliated entities with closely related financial affairs and business operations, and joint administration will ease the administrative burden on the parties.

31. The Foreign Representative anticipates that the various notices, applications, motions, other pleadings, hearings and orders in these cases will affect each of the Debtors. The failure to administer these cases jointly would result in duplicative pleadings and service. Such unnecessary duplication would impose avoidable expenses on all interested parties.

32. Joint administration will permit this court to use a single docket for the jointly administered cases and combine notices to creditors and other parties-in-interest of the Debtors' estates.

33. Joint administration will protect parties-in-interest by ensuring that such interested parties will be appropriately apprised of all matters before the Court in each of the jointly administered cases.

IMPAC 6509970v.3

E.  **Motion to Establish Certain Notice Procedures in Connection with Filing of Verified Petitions Under Chapter 15**

34. Contemporaneously with the filing of these Chapter 15 Cases, the Foreign Representative filed a motion (the "Notice Procedures Motion") requesting this Court to enter an order specifying the form and manner of service of the notice (the "Recognition Notice") regarding (i) the filing of the Debtors' Chapter 15 Petitions and certain related pleadings, including the Recognition Motion, (ii) the deadline to object (the "Recognition Objection Deadline") to this Court's entry of a final order granting recognition of the Canadian Proceeding as a foreign main proceeding under the Bankruptcy Code (the "Recognition Order") and enforcing the CCAA Order on a permanent basis in the United States, and (iii) the hearing (the "Recognition Hearing") for this Court to consider the Chapter 15 Petitions and entry of the Recognition Order.

35. The Debtors have hundreds of potential creditors and other parties-in-interest, all of which need to be provided with notice of the Provisional Relief Order (once entered), the proposed Recognition Order, the Recognition Objection Deadline and the Recognition Hearing. Under the facts and circumstances of these Chapter 15 Cases, the Foreign Representative submits that service of the Recognition Notice in the manner proposed in the Notice Procedures Motion will provide the various parties-in-interest in these Chapter 15 Cases due and sufficient notice and service of such matters and any associated objection deadline and hearing dates.

36. Furthermore, the Recognition Notice provides multiple efficient ways for any party receiving such notice to obtain copies of pleadings filed in these Chapter 15 Cases, as it provides a telephone number, a website maintained by the Foreign Representative and an email address that can be used to obtain such documents. At the same time, it does not burden the Foreign Representative or the Debtors with the significant costs necessarily attendant to copying

and mailing the various documents associated with the Recognition Notice to hundreds of creditors and other parties-in-interest.

**F.    Motion for Assumption of Agency Agreement with Gordon Brothers**

37.    Contemporaneously with the filing of these Chapter 15 Petitions, the Foreign Representative filed the *Foreign Representative's Motion for Interim and Final Orders Authorizing (I) the Debtors to Assume the Agency Agreement, (II) the Conduct of the Store Closing Sales, with Such Sales to Be Free and Clear of All Liens, Claims and Encumbrances, and (III) Granting Related Relief* (the "Agency Assumption Motion").  The Agency Assumption Motion requests that this Court enter an order assuming an Agency Agreement with Gordon Brothers (the "Agency Agreement").

38.    A summary of the material provisions of the Agency Agreement are provided in the Agency Assumption Motion and incorporated herein by reference.

39.    Under the terms of the Agency Agreement, subject to the Court's approval of the Proposed Orders, the Agent will serve as the exclusive agent to MTA for the purpose of conducting a sale of assets (the "Liquidation Sales") including but not limited to (a) all inventory, supplies, finished goods, raw materials, work-in-process, samples, in-transit, packaging materials and other inventory of the Company as set forth on Exhibit A to the Agency Agreement (the "Inventory"); (b) all accounts receivable and intercompany receivables (together the "Accounts Receivable") and (c) All equipment, computer systems, computer hardware, wiring & connections, vehicles, rolling stock, tools equipment, spare parts, furnishing, office equipment, fixtures, furniture, and other fixed Assets which are owned by the Company (collectively, the "Equipment and FF&E" and together with the Inventory and the Accounts Receivable the "Assets") wherever located, including the Company's warehouses in Louisiana,

California, and Ohio (the "<u>Facilities</u>"), using the procedures outlined in the Agency Agreement, and, subject to the terms contained in the Agency Agreement.

40. Based upon the results of their exhaustive analysis of the Debtors' ongoing and future business prospects, the Foreign Representative has concluded that conducting the Liquidation Sales in accordance with the procedures set forth in the Agency Agreement is the best method to maximize recoveries to the Debtors' estates. The efficient and effective liquidation sales and procedures, as contemplated in the Agency Agreement and the services to be provided by Agent, will allow the Debtors to quickly vacate the Facilities and avoid the accrual of unnecessary administrative expenses, while maximizing the value of the Assets.

41. Furthermore, the Foreign Representative requests approval to sell the Assets on a final "as is" basis, free and clear of liens, claims, interests and encumbrances, in accordance with section 363 of the Bankruptcy Code. For the liquidation to be effective, all sales must be final, with the proceeds paid to the Debtors and the Agent in accordance with the terms of the Agency Agreement. I am informed that it is appropriate to sell the Assets on a final "as is" basis, free and clear of any and all liens, claims, and encumbrances in accordance with section 363(f) of the Bankruptcy Code because one or more of the tests of section 363(f) are satisfied. The Debtors' first lien lender, BMO, has consented to the sales process in the Agency Agreement. While the Foreign Representative believes that it is unlikely that any recovery from the Assets in excess of BMO's liens will be received, in the event BMO's liens are satisfied, the Debtors' junior lienholders, and potentially unsecured creditors, would have claims that would attach to the proceeds of the Liquidation Sales. Thus, I am informed that the Liquidation Sales will satisfy one or more of the conditions set forth in section 363(f) of the Bankruptcy Code.

IMPAC 6509970v.3

42. Moreover, the Foreign Representative's ability to successfully maximize the value of the Debtors' assets depends in large part upon his ability to continue using the experience and knowledge of the Agent—including its experience with and knowledge of the Debtors' business—to conduct the Liquidation Sales. The Agent will be required to commit significant capital, energy and efforts to conduct the Liquidation Sales. Any disruption to the Liquidation Sales during the interim period would cause significant and unnecessary delays to the process of selling the Assets and may impair the Debtors' ability to receive the necessary funds under the Agency Agreement. For the overall benefit to the Debtors' liquidation efforts, payment of the Agent Claims will ensure maximum value for all interested parties.

43. The states in which the Facilities are located have or may have licensing and other requirements governing the conduct of store closing, liquidation, or other inventory clearance sales, including (but not limited to) state and local rules, laws, ordinances, and regulations related to store closing and liquidation sales, establishing licensing, permitting, or bonding requirements, waiting periods, time limits, bulk sale restrictions, augmentation limitations or fast pay laws that would otherwise apply to the Liquidation Sales, or consumer fraud laws, with the exception of deceptive advertising laws (collectively, the "Liquidation Laws"). Many such Liquidation Laws, however, provide that court-authorized liquidation sales are exempt from compliance therewith. Because the Liquidation Sales will be held under the supervision of the Court, the Foreign Representative submits that the Liquidation Laws should not apply to the Liquidation Sales under the Agency Agreement. To the extent a dispute arises regarding the applicability of a Liquidation Law, the proposed interim order provides a mechanism to resolve such disputes.

44. Finally, certain of the Debtors' leases governing the premises of the Facilities may contain provisions purporting to restrict or prohibit the Debtors or the Foreign

Representative from conducting store closing, liquidation, or similar sales. I understand that courts have found such provision to be unenforceable in the context of chapter 11 bankruptcy cases, as they constitute an impermissible restraint on a debtor's ability to properly administer its reorganization case and maximize the value of its assets under section 363 of the Bankruptcy Code. The Foreign Representative submits that the same result should hold under section 363 in a chapter 15 context as well and requests that the Court authorize the Foreign Representative and/or the Agent to conduct any liquidation sales without interference by any landlords or other persons affected, directly or indirectly, by the liquidation sales.

45.     The Debtors have insufficient funding to continue operations for any significant period of time beyond the timeframe proposed in the Agency Agreement and the value of the Debtors' inventory will decline absent a prompt sale, especially in the winter months, when the Debtors' inventory is at its lowest value. The Agency Agreement allows for a timely and efficient liquidation process. Absent the relief requested, the Debtors would run the risk that the assets would significantly dissipate in value pending the conclusion of a prolonged auction and sale process. Accordingly, the Foreign Representative believes that, under the facts and circumstances, the assumption of the Agency Agreement is appropriate, and structured in a manner which will allow the Debtors to preserve and maximize the value of the assets.

46.     Pursuant to 28 U.S.C. § 1746, I certify under penalty of perjury that, based upon my knowledge, information and belief as set forth herein, the foregoing is true and correct.

**Signature Page Follows**

Dated:  December 19, 2019

_____
Maxime Codère, on behalf of KPMG, Inc., in its capacity as the court-appointed monitor and duly authorized foreign representative of the Debtors

# **Exhibit A**

